# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

IN RE:                                   )
                                         )
Go Ye Village, Inc.,                     )          **Case No. 15-81287**
                                         )          **(Chapter 11 )**
     Debtor.                             )
                                         )

## AMENDED MOTION TO APPROVE REJECTION OF EXECUTORY CONTRACT WITH MORRISON MANAGEMENT SPECIALISTS, INC.

Go Ye Village, Inc. ("Debtor"), the debtor-in-possession herein, by and through its counsel, Sam G. Bratton II and J. Patrick Mensching of the firm, Doerner, Saunders, Daniel & Anderson, L.L.P., and pursuant to 11 U.S.C. § 365(a) and Federal Rule of Bankruptcy Procedure 6006, requests that the Court enter an Order approving Debtor's rejection of an executory contract between Debtor and Morrison Management Specialists, Inc. ("Morrison"). As support therefore, Debtor will show the Court the following:

### Jurisdiction

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). Reference to the Court of this matter is proper pursuant to 28 U.S.C. § 157(a) and LCvR 84.1 of the United States District Court for the Eastern District of Oklahoma and 11 U.S.C. § 365(a). Venue is proper pursuant to 28 U.S.C. § 1408 and 1409.

### Background

2.     Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on November 30, 2015. Upon filing, it began and continues to operate as debtor-in-possession, with all rights, powers, and duties of a trustee in bankruptcy pursuant to 11 U.S.C. §§ 1107 and 1108.

3.     Debtor operates a fully accredited, continuous care retirement community.

4.     On October 16, 2006, Debtor entered into an Agreement with Morrison that provided, among other things, for the latter's operation of a dining services program for Debtor's residents. A copy of the Agreement is annexed. Morrison has equipment and other property located on the Debtor's premises used in performance of the Agreement.

5.     On January 27, 2016, Debtor gave Morrison written Notice of Debtor's rejection of the Agreement, effective at close of business February 29, 2016.

## Discussion

6.     Section 365(a) of the Bankruptcy Code provides that a debtor-in-possession "may assume or reject any executory contract or unexpired lease" subject to court approval. 11 U.S.C. § 365(a). The decision to assume or reject an executory contract or lease is left to the sound business judgment of the debtor-in-possession. *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2nd Cir. 1993).

7.     Under the business judgment standard, a court will not question the decision of the debtor-in-possession regarding assumption or rejection unless the decision is made in bad faith or constitutes a gross abuse of discretion. *Lubrizol Enters. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043, 1047 (4th Cir. 1985).

8.     The process of granting a motion to assume or reject an executory contract or lease requires a bankruptcy court to place itself in the position of the debtor-in-possession and determine whether assumption or rejection would be wise from a business perspective. *Orion Pictures*, 4 F.3d at 1099. In evaluating the business judgment of the debtor-in-possession, courts traditionally weigh various factors, including: (i) whether assumption or rejection will benefit the debtor-in-possession; (ii) whether assumption or rejection will unduly burden the other party to the executory contract or lease; (iii) whether assumption or rejection will unduly burden the

Case 15-81287    Doc 103    Filed 01/29/16    Entered 01/29/16 16:17:21    Desc Main
Document    Page 2 of 17

unsecured creditors of the bankruptcy estate; and (iv) whether assumption or rejection will increase the debtor-in-possession's possibility of reorganization. *See In re Valley View Shopping Center, L.P.*, 260 B.R. 10, 39 (Bankr. D. Kan. 2001).

9.      The Debtor's decision to reject the Agreement with Morrison is sound under the circumstances. The rejection will allow Debtor to procure the same services from another vendor at a lower cost and thereby increase Debtor's ability to reorganize its business.

WHEREFORE, Debtor requests the Court enter an Order approving Debtor's rejection of the Agreement and authorizing Morrison to remove its equipment and property from the Debtor's premises upon the effective date of rejection of the Agreement, and for such other relief that the Court deems reasonable and just.

DOERNER, SAUNDERS, DANIEL
& ANDERSON, L.L.P.


By: */s/ J. Patrick Mensching*
    Sam G. Bratton II, OBA No. 1086
    J. Patrick Mensching, OBA No. 6136
    Two West Second Street, Suite 700
    Tulsa, OK 74103-3117
    Telephone 918.591.5240
    Facsimile 918.925.5240
    sbratton@gmail.com
    pmensching@dsda.com
    **ATTORNEYS FOR DEBTOR**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on 29th day of January, 2016, a true and correct copy of the foregoing document was served electronically on participants in the CM/ECF system according to local procedures, and was mailed by first class U.S. Mail, postage prepaid to:

Morrison Management Specialists, Inc.
5801 Peachtree Dunwoody Road
Atlanta, GA 30342

and was sent via email to Andrew Sherman, asherman@sillscummis.com


/s/ J. Patrick Mensching
J. Patrick Mensching


3691128v1

# AGREEMENT

THIS AGREEMENT (the "Agreement") is made effective as of October 16, 2006, (the "Effective Date") between GO YE VILLAGE located at 1201 West Fourth, Tahlequah, Oklahoma 74464 (the "Client") and MORRISON SENIOR DINING, a division of Morrison Management Specialists, Inc. a Georgia corporation ("Morrison"), with offices located at 5801 Peachtree Dunwoody Road, Atlanta, Georgia 30342.

The Client desires to have Morrison operate and manage the Client's dining services operation and provide Services as described in this Agreement. In consideration of the premises and covenants herein, the parties mutually agree as follows:

## ARTICLE 1 - SERVICES

1.1 **Engagement.** The Client agrees to retain Morrison to exclusively provide the Services for the Client's dining services program or department (the "Program" or "Department"), and Morrison agrees to provide the Services on the Client's behalf as the Client's agent.

1.2 **Personnel.** (a) Morrison will furnish the management personnel, (the "Management Personnel") to provide the Services on-site at the Facility. Morrison shall pay the Management Personnel and bill Client for salaries and costs of the Management Personnel, including Morrison's Management Percentage Rate which will initially be established at 37.25%. The Client may request removal of any Morrison Management Personnel and Morrison will comply, provided such request is lawful, reasonably justified in writing, and Morrison is first given an opportunity to respond and address such issues consistent with this Agreement.

(b) All hourly personnel and dietitians of the Program and the Department who work at the Facility (the "Hourly Personnel") will be provided by and carried on the Client's payroll, and the Client will pay all expenses in connection with the Hourly Personnel.

1.3 **Purchasing.** (a) Responsibilities for paying vendors directly for the following items are indicated below (M = Morrison; C = Client). Purchases by Morrison will be charged to the Client in accordance with Article 2 of this Agreement.

| | Morrison Senior Dining | Client |
|---|---|---|
| Food....................................................... | M | |
| Office supplies/stationery............................... | M | |
| In-service training materials/supplies.............. | M | |
| Telephone service........................................... | | C |
| Telephone long distance.................................. | | C |
| Laundry......................................................... | | C |
| Cleaning/dishwashing supplies........................ | M | |
| Menu paper and print...................................... | M | |
| Copying......................................................... | | C |
| Kitchen paper/plastic....................................... | M | |
| Marketing/merchandising materials for operation.... | M | |
| Resident education materials/guides.......................... | M | |
| Business licenses and permits................................... | | C |
| Computer hardware/printer paper......................... | M | |
| Computer software................................................. | M | |
| Computer related charges....................................... | M | |
| Utilities.................................................................. | | C |

1

| | Morrison Senior Dining | Client |
|---|---|---|
| Pest control............................................................................. | | C |
| Employee physicals, background checks and testing............ | | C |
| Garbage/trash removal............................................................ | | C |
| Service contracts (on-going).................................................. | | C |
| Repairs - purchased services (as occurs).............................. | | C |
| Rented/leased equipment........................................................ | | C |
| Smallwares replacement ........................................................ | M | |
| Tablewares replacement ........................................................ | M | |
| Minor equipment replacement.(less than $500)....................... | | C |
| Major equipment replacement.($500 or more)......................... | | C |
| Postage.................................................................................... | M | |
| Uniforms.................................................................................. | M | |
| Armored car service............................................................... | N/A | |
| Parking ................................................................................... | N/A | |

(b) Until full reimbursement, title to the above items shall remain with the party who pays the vendor directly. Notwithstanding anything to the contrary, all computer hardware and software furnished by or through Morrison, as well as any of Morrison's Proprietary Information, shall remain the property of Morrison (even if fully depreciated). Client will provide internet access to Morrison at no cost to Morrison.

(c) Morrison's Management Personnel will determine the specifications for and order food and other supplies to be used in the Program and Department. Morrison is entitled to utilize its national account or other vendor systems and the Client will receive the same price savings as Morrison's other clients. If vendors extend to Morrison any credits or discounts which are exclusively related to the Client's operation of the Department, such credits or discounts shall be passed on to the Client. If vendors extend to Morrison any company-wide credits, fees or discounts, including, without limitation, any early payment discounts, administrative fees or volume discounts, Morrison will be entitled to retain such credits, fees or discounts.

1.4 **Client Facilities.** (a) The Client will furnish a Facility that is equipped and furnished to the reasonable satisfaction of Morrison and the Client. The Client will ensure that the Facility (including the kitchen) is in good, clean, sanitary, working condition, as of the beginning of Morrison's Services. The Client will maintain the Facility and all items furnished by the Client (the "Property") in accordance with Applicable Law, and make all repairs or replacements to the Facility and Property at its expense, except that Morrison shall be responsible for damage to the same caused by the gross negligence of Morrison's employees (other than as provided in Section 6.4).

(b) Cleaning responsibilities will be as follows (M = responsibility of Program managed by Morrison; C = responsibility of Client, not Morrison managed):

| | Morrison Senior Dining | Client |
|---|---|---|
| **Kitchen** | | |
| Floors........................................................................... | M | |
| Walls............................................................................ | M | |
| Equipment.................................................................... | M | |
| Refrigerators and freezers.......................................... | M | |
| Vents............................................................................ | | C |
| Ceiling.......................................................................... | | C |
| Duct work..................................................................... | | C |
| Light replacement........................................................ | | C |

2

T:\Legal\DOCS\K\Senior Dining\Go Ye Village\Goyefee082206.Doc

| | Morrison Senior Dining | Client |
|---|:---:|:---:|
| **Storage Areas for Program** | | |
| Floors............................................................. | M | |
| Walls............................................................... | M | |
| Ceiling............................................................. | | C |
| Shelving.......................................................... | M | |
| **Dining Area** | | |
| Furniture.......................................................... | | C |
| Equipment........................................................ | | C |
| Floors/carpet................................................... | | C |
| Windows/walls.................................................. | | C |
| Ceiling............................................................. | | C |
| Drapery............................................................ | | C |
| **Floor Stations** | | |
| Equipment........................................................ | M | |
| Floors.............................................................. | | C |
| Walls/ceilings................................................... | | C |
| Refrigerators and freezers................................ | | C |
| **Receiving Area for Program** | | |
| Pick-up/spot mop.............................................. | M | |
| Daily cleaning.................................................. | | C |

(c) With regard to all cafe' and dining related areas, Morrison will be responsible for cleaning the non-public/non-customer portion of the areas assigned to it where the employees of the Program perform work and the Client will be responsible for cleaning and maintenance of the other areas and portions, such as where there is public or customer access/use.

1.5 **Inventories.** (a) The Client will provide and maintain a fully adequate inventory and supply of Tablewares and Smallwares for satisfactory operating requirements, in Morrison's opinion, at the Client's expense. The parties understand that Tablewares and Smallwares requirements may vary due to changes in service. If Morrison furnishes Tablewares or Smallwares, it will bill the Client for the same, including for loss and breakage based on inventories conducted by Morrison from time-to-time.

(b) The parties will also jointly prepare an inventory of food and dietary supplies of the Client with a dollar value based upon then current purchase prices (the "Beginning Inventory") Upon termination of this Agreement, the parties will jointly prepare an ending inventory of such food and dietary supplies with a dollar value based upon then current purchase prices (the "Ending Inventory"). If the aggregate value of the Ending Inventory is less than the Beginning Inventory, Morrison shall credit the Client for the difference. If the aggregate value of the Ending Inventory is greater than the Beginning Inventory, Morrison shall charge the Client for the difference.

(c) Morrison will charge the Client for food and supplies based on the amount of inventory used by Morrison for the month being billed.

(d) Each party will retain ownership of the items they provide, until full reimbursement/payment of all amounts under this Agreement.

(e) The amount of the Beginning Inventory will be attached to this Agreement as Exhibit A.

3

T:\Legal\DOCS\K\Senior Dining\Go Ye Village\Goyefee082206.Doc

1.6 **Meetings & Resident Satisfaction Survey.** In order to improve communication and effectiveness, the parties agree to meet at mutually agreeable times and places to discuss performance and expectations under this Agreement. This includes having an initial transition and expectation meeting(s) prior to the start of Morrison's services and subsequent meetings at least annually, with participation by appropriate senior management of each party who have decision making authority. In addition, Client agrees to allow Morrison to survey the facility once per year utilizing its then current resident satisfaction tool (at execution of this Agreement, a Press Ganey survey) which will assist Morrison in evaluation of its performance and in establishing procedures and goals for improvement of service to the Client.

## ARTICLE 2 - COMPENSATION

2.1 **Billing.** (a) The Client will pay Morrison for the Services in accordance with invoices and monthly billings submitted by Morrison, which will reflect amounts due and adjustments from prior billings. Payments are due within fourteen (14) days of billing and shall be paid by electronic transfer of funds on or before the 14th day to a bank account designated by Morrison in Morrison's name; any sums unpaid thereafter shall bear interest at the lesser of one and one-half (1½%) percent per month or the highest rate permitted under Applicable Law, accruing from the date of billing to the date of payment.

(b) On the first day of each month Morrison will bill the Client in advance $27,115.66, which amount represents the projected costs to be incurred by Morrison for the month being billed (the "Pre-Bill Invoice"), which includes the management fee and general administrative charges in Paragraph 2.2 (a) below.

(c) After the close of each month Morrison will issue a Reconciliation Invoice (generally on the tenth (10th) of each month which will identify the actual costs incurred by Morrison in connection with the Services for the month that has closed along with any other charges that Morrison is entitled to make under the terms of this Agreement. Any amounts paid by the Client pursuant to the Pre-Bill Invoice will be credited toward the appropriate Reconciliation Invoice. If the Reconciliation Invoice identifies a charge that is owed by the Client (i.e., the actual costs for the month exceeded the amount of the Pre-Bill invoice), then the Client will pay that charge in accordance with paragraph 2.1(a). If the Reconciliation Invoice identifies a credit to the Client, then the credit will be applied to Morrison's next Reconciliation Invoice.

(d) A sample bill is attached hereto as Exhibit B for informational purposes only. In the event of a conflict between the terms of this Agreement and the sample bill, the terms of this Agreement will control.

2.2 **Management Fee.** The Client further agrees to pay Morrison as follows:

(a) Morrison shall be allowed to charge and receive payments for general and administrative charges and management service fees, payable in equal, consecutive monthly installments annually which are included in the Pre-Bill in 2.1(b). Morrison's general and administrative charges will be $15,000 annually, and Morrison's management service fee will be $30,000.

(b) For each subsequent new Client budgetary year following execution of this Agreement, the charges outlined above shall be increased by a percentage corresponding to the increase in the CPI.

4.

T:\Legal\DOCS\K\Senior Dining\Go Ye Village\Goyefee082206.Doc

(c)    The Client shall bear all costs and any losses in connection with the operation, including but not limited to payroll costs, Morrison's fees and charges, general liability and all other insurance and all food, supply and other standard costs. Nothing contained in this Agreement shall be construed as a representation or guarantee by Morrison that any financial, budgetary, performance or other goals will be met.

2.3 **Initial Payment.**   Prior to beginning of Services the Client will pay to Morrison $23,365, which is an amount equal to one month's projected costs of operation to be paid by Morrison. Upon termination of this Agreement, the amount of Morrison's final billing to the Client will be adjusted to reflect this initial payment by the Client (which is non-interest bearing).

2.4 **Opening Costs.** The Client agrees to pay Morrison $15,000, representing a portion of Morrison's opening costs such as employee relocation and instructional expenses.    The $15,000 shall be due with Morrison's first billing. In addition, if opening costs exceed $15,000 due to additional relocation expenses all such additional costs shall be borne by Client.    If this Agreement terminates prior to full reimbursement of Morrison's opening costs, then the Client agrees to pay Morrison immediately this amount.

2.5 **Cash Received.**   Any cash sales received from the Program by Morrison will be delivered to the Client's business office.

<h2 align="center">ARTICLE 3 - TERM AND TERMINATION</h2>

3.1 **Term.**   The initial term of this Agreement will extend from the Effective Date for a period of three (3) year(s) (the "Initial Term") and automatically renews for successive one (1) year periods, unless earlier terminated:

(a) at any time by mutual written agreement;

(b) by either party without cause, effective upon the next anniversary of the Effective Date, provided that (1) the third anniversary of the Effective Date has passed and (2) the party seeking such termination provides at least ninety (90) days prior written notice to the other party;

(c) by Morrison upon seven (7) days prior written notice if the Client fails to pay any amounts due within thirty (30) days from the date of Morrison's billing; and

(d) by either party for cause for the other party's failure to perform any duty or obligation under this Agreement in accordance with paragraph 3.3.

3.2 **Changes in Ownership/Administration.**   Notwithstanding §3.1, because significant effort and expense has been made by each party in developing this relationship and opportunity, the parties agree that termination of this Agreement will not be initiated by Client within six (6) months of a significant change in Client's ownership or administration, unless such termination is based upon a material breach of this Agreement by Morrison which is not cured within thirty (30) days of written notice to Morrison.

3.3 **Termination for Cause:**    If Morrison is not performing Services in accordance with the requirements of this Agreement, or if Client is not performing its obligations under this

5

Agreement (other than its obligation to pay, which is governed by paragraph 3.1(c)), and Client or Morrison (as applicable) desires to terminate this Agreement for cause, the party seeking such termination must give the other party sixty (60) days written notice of its intention to cancel this Agreement if such service or other deficiencies are not corrected within that time (the "Cure Period"), which notice shall specify the service area defaults in detail. At the end of the sixty (60) days Cure Period, the party seeking such termination shall determine that either (i) the service or other deficiencies have been corrected, in which case the contract will continue in full force and effect subsequent to the Cure Period, or (ii) the service or other deficiencies have not be corrected, in which event the party seeking termination may, by further written notice, cancel this Agreement sixty-(60) days from the end of the Cure Period. In the event that the party seeking such termination does not act pursuant to either (i) or (ii) above, the service or other deficiency shall be deemed corrected and the Agreement shall continue in full force and effect thereafter.

3.4 **Advanced Billing Upon Receipt of Termination Notice.** Upon the issuance of a notice of termination, the Client will be required to pay immediately for the undepreciated or unamortized amount of any Morrison Investments or any other amounts that the Client is required to pay to Morrison upon termination of this Agreement. The amount of the charge will be the amount that will be due from the Client as of the effective date of the termination.

## ARTICLE 4 - COMPLIANCE WITH LAWS

4.1 **Compliance.** Morrison and the Client agree to comply with all Applicable Laws, including applicable federal and state laws and regulations.

4.2 **Sales and Other Taxes.** The Client will be responsible and pay for all taxes, fees, assessments and licenses, including without limitation, any sales and use taxes including sales taxes collected from the Client's café or retail facilities, liquor licenses, personal property taxes on equipment or investments provided by Morrison, taxes on operation of the Facility, any taxes imposed on Morrison's fees or other charges to the Client pursuant to this Agreement, and any of the above that result from new taxes, legislation or enforcement positions.

4.3 **Exemptions.** The Client will be responsible for providing Morrison any applicable exemption or resale certificate(s) related to Morrison's Services for the Client.

4.4 **Non-discrimination.** Neither party will discriminate in any unlawful manner. Any changes necessary to the physical facility to comply with the Americans with Disabilities Act will be the Client's responsibility.

## ARTICLE 5 - EMPLOYMENT RESTRICTION

5.1 **Protection for Client Employees.** During this Agreement and for one year after its termination (the "Period of Restriction"), Morrison will not, either directly or indirectly, on its own behalf or for others, divert, solicit or hire away, without the Client's prior written approval, any management, clinical or professional employee working in the Client's Department and on the Client's payroll at any time during the term of this Agreement (the "Protected Client Employees"). Provided, however, the term Protected Client Employees shall not include: (a) Management Personnel employed by Morrison, (b) employees provided by Morrison for assignment to the Department, and (c) employees hired by Morrison pursuant to Article 1 of this Agreement. If Morrison violates this Section 5.1, then Morrison agrees to pay an amount equal to two (2)

6

Case 15-81287    Doc 103    Filed 01/29/16    Entered 01/29/16 16:17:21    Desc Main
Document    Page 10 of 17

years' salary of such personnel, as liquidated damages and not as a penalty. Acceptance of such payment does not constitute a waiver of any other remedies or rights the Client may have either at law or in equity, including temporary restraining orders or injunctive relief.

5.2 **Protection for Morrison Employees.** During the Period of Restriction, the Client will not, either directly or indirectly, on its own behalf or for others, divert, solicit or hire away, without Morrison's prior written approval, any then current or former Morrison management, clinical or professional personnel, or allow such personnel to perform services directly or indirectly for the Client or on or from its Facility or property (whether employment is by Client, a subsequent third party contractor, or otherwise). If the Client violates this Section 5.2, then the Client agrees to pay an amount equal to two (2) years' salary of such personnel, as liquidated damages and not as a penalty. Acceptance of such payment does not constitute a waiver of any other remedies or rights Morrison may have either at law or in equity, including temporary restraining orders or injunctive relief.

## ARTICLE 6 - INSURANCE AND INDEMNITY

6.1 **Liability Insurance.** Morrison agrees to obtain public liability and products liability insurance in the amount of $1,000,000 combined single limits, or maintain a program of self-insurance, in connection with the goods and Services furnished by Morrison under this Agreement. Morrison shall invoice the Client for such insurance coverage based upon Morrison's company-wide rate applied to managed volume.

6.2 **Worker's Compensation.** Both parties will furnish and maintain workers' compensation insurance as prescribed by law and employer's liability insurance in the amount of $100,000 for all of their respective employees, or either party may provide such coverage through a self-insurance program in accordance with Applicable Law. If requested, each party agrees to furnish the other with a certificate of such insurance (unless self-insured). Each party further agrees to bear its own cost and to hold the other party harmless from any claims by its own employees covered by such workers' compensation insurance/self-insurance. If a workers' compensation injury results in lost time or medical expenses for a Morrison employee, then Morrison's standard unit claim charge will be applied as a cost of operation. This standard unit claim charge may be adjusted annually, and is currently $750 per claim.

6.3 **Indemnity.** (a) Subject to Sections 6.2 and 6.4, Morrison shall indemnify, defend and hold harmless the Client and its officers, agents and employees, with respect to any and all liability, losses, claims, suits, damages, taxes, charges and demands of any kind and nature by any party which any of them may incur or suffer as a result of any cause of action relating solely to or arising solely out of any negligent act or omission of Morrison. Morrison will not be responsible for indemnifying, defending or holding the Client harmless with respect to any and all liability, losses, claims, suits, damages, taxes, charges or demands that arise out of the Client's acts or omissions.

(b) Subject to Sections 6.2 and 6.4, the Client shall indemnify, defend and hold harmless Morrison and its officers, agents and employees, with respect to any and all liability, losses, claims, suits, damages, taxes, charges and demands of any kind and nature by any party which any of them may incur or suffer as a result of any cause of action relating solely to or arising solely out of any negligent act or omission of Client. The Client will not be responsible for indemnifying, defending or holding the Morrison harmless with respect to any and all liability, losses, claims, suits, damages, taxes, charges or demands that arise out of Morrison's acts or omissions.

7

6.4 **Release.** Morrison and the Client release each other from any responsibility for damage to the Facility or other property owned by either party, caused by fire or other casualty and resulting directly or indirectly from the use or occupancy of the Facility or any portion thereof by Morrison. Each party agrees to notify its respective insurance carrier(s) of this release.

## ARTICLE 7 - FORCE MAJEURE

7.1 **Force Majeure Events.** Neither Morrison nor the Client shall have any liability for failing to perform this Agreement when performance is prevented by force majeure. The term "force majeure" shall mean any government requirement or request, war, public disorders, acts of enemies, sabotage, strikes, lockouts, picketing, labor or employment difficulties, fires, floods, acts of God, natural disasters, accidents or breakdowns (whether or not preventable), or any other cause beyond the reasonable control of either party.

7.2 **Services Under Force Majeure.** The Client and Morrison understand and agree that events such as hurricanes, tornadoes, fires, floods, concerted employee, union or related activity, or similar severe weather, natural disasters, or labor unrest may interfere with the efficient performance and contemplated operations under this Agreement, and will result in direct and indirect costs not reflected in the above rates and charges. The parties agree that under such conditions, Morrison will work together with the Client in good faith to provide services and develop appropriate responses and courses of action, as is practical and reasonable under the circumstances. In the event that the Client requests that Morrison provide the Services during a force majeure event, any financial or performance guarantees or incentive penalties to Morrison will not apply under these conditions and instead the Client will be responsible for, and hold Morrison harmless from, all costs and expenses associated with the services, responses, courses of action, and operations, whether directly or by reimbursement to Morrison, along with the fees and charges referenced above.

## ARTICLE 8 - PROPRIETARY INFORMATION

8.1 **Existence.** During the term of this Agreement, the Client acknowledges that it may acquire, be exposed or obtain access to Proprietary Information of Morrison.

8.2 **Protection.** All Proprietary Information is confidential to Morrison and at all times will be Morrison's sole and exclusive property. In the event the Client receives, obtains access or otherwise is exposed to any Proprietary Information, the Client will, and shall cause its officers, employees and agents to:
   (1) hold the Proprietary Information in trust and in strictest confidence;
   (2) not produce, use, copy, distribute or otherwise disseminate the Proprietary Information except to the extent necessary to aid Morrison in performing the Services; and
   (3) otherwise protect the Proprietary Information from disclosure.

8.3 **Disclosure.** Disclosure of Proprietary Information by the Client will not be made to anyone except as necessary for performance of Morrison's Services on a specific need to know basis to those who have agreed to hold the Proprietary Information in trust and strictest confidence in accordance with the terms of this Agreement. The Client will take reasonable precautions to prevent disclosure of Proprietary Information to anyone without a need to know such information.

8

Case 15-81287   Doc 103   Filed 01/29/16   Entered 01/29/16 16:17:21   Desc Main
                          Document       Page 12 of 17

8.4 **Return.** Upon request by Morrison, and in any event upon termination of this Agreement, the Client shall return all property belonging to Morrison that is in the Client's custody, control or possession, including all materials containing Proprietary Information.

## ARTICLE 9 - MISCELLANEOUS

9.1 **Notices.** All notices under this Agreement will be:
(a) in writing;
(b) sent prepaid via certified/registered mail, hand delivery or confirmed facsimile (with follow up by another approved notice method); and
(c) sent to the above address, or at such other address as may be designated in writing.
The Client shall also deliver any notice to Morrison at the Facility. Notices are deemed received upon actual receipt.

9.3 **Entire Agreement and Severability.** This Agreement constitutes the entire agreement of the parties with respect to the subject matter. Neither party has relied on any representation, promise, agreement, condition or understanding which is not expressly set forth herein. The terms of this Agreement may not be amended or modified except by a further written statement signed by the parties specifically referencing this Agreement. In case any part of this Agreement is held invalid, illegal or unenforceable, it shall not affect any other provision.

9.4 **Successors/Assignment.** This Agreement will inure to the benefit of, be binding on, and be enforceable by, the Client and Morrison and their lawful successors, representatives and assigns. Either party may assign this Agreement to a parent company, affiliate or subsidiary without notice to the other party. No other assignment shall be valid unless the assignor obtains the prior written consent of the other party.

9.5 **Enforcement.** If Morrison deems it necessary to enforce this Agreement, the Client shall pay to Morrison upon demand all costs and expenses incurred by Morrison in connection with such enforcement, including attorney's fees. No failure or delay on the part of either party in exercising any right or remedy under this Agreement shall operate as a waiver. No provision of this Agreement may be waived except specifically and in writing.

9.6 **Applicable Law.** The parties agree that this Agreement shall be deemed as having been executed in the offices of Morrison listed above. This Agreement will be governed by and construed in accordance with the laws of the State of Oklahoma. Venue for any litigation arising out of this Agreement shall be an Oklahoma state or federal court of competent jurisdiction.

9.7 **Survival.** Upon termination, all rights and obligations under this Agreement will end (except for accrued, unpaid compensation, and the provisions of Articles 5, 6 and 9, all of which will survive such termination).

## ARTICLE 10 - MEDIATION AND ARBITRATION

10.1 For any dispute between the parties relating to this Agreement, they will first try to resolve it through good faith negotiations. If it cannot be resolved by negotiation, it will be mediated. Thereafter, any unresolved dispute shall be placed in non-binding arbitration, or binding arbitration upon agreement of both parties. Mediation and arbitration will be in accordance with the then current Commercial Rules of the American Arbitration Association, and

9

T:\Legal\DOCS\K\Senior Dining\Go Ye Village\Goyefee082206.Doc

will take place in the Oklahoma City metropolitan area. The parties agree to exercise their best efforts to promptly settle such disputes in order to minimize costs.

## ARTICLE 11 - DEFINITIONS

11.1 "**Applicable Law**": statutes, regulations, ordinances and other legal requirements, to the extent applicable to Morrison and the Client.

11.2 "**At Cost**" or "**Cost**": the charge by Morrison to Client for items or services that will include all applicable supply, labor (with Percentage Rate), general liability or other insurance, equipment and other related operational costs required for the item or service, but will not include any separate, additional fee by Morrison that is not otherwise provided for in this Agreement.

11.3 "**CPI**": the adjustment to rates and charges based on the increase over the prior year in the "Consumer Price Index, U.S. All Urban Consumers Food Away From Home (CPI)" published by the United States Department of Labor, Bureau of Labor Statistics.

11.4 "**Facility**": the areas, improvements, real and personal property and facilities of the Client, and in particular those related to or used in providing the Services.

11.5 "**Management Percentage Rate**" and "**Hourly Percentage Rate**": A percentage rate of payroll charge which relates to direct and indirect payroll taxes, workers' compensation insurance, employer's portion of state and federal unemployment compensation tax, social security tax, accident and health insurance, life insurance and retirement plan contributions, fringe benefits and related overhead. Incentive pay is also part of Morrison's Management Personnel costs, and may be included in the Management Percentage Rate or charged separately. Morrison's applicable Management Percentage Rate and Hourly Percentage Rate shall be subject to an annual increase each year that this Agreement is in effect (generally on September 1 of each year commencing on September 1, 2007). The new Management Percentage Rate and Hourly Percentage Rate will be the lower of: (1) the new Morrison Management Percentage Rate and Hourly Percentage Rate that is applicable to the Client's account or (2) the existing Management Percentage Rate and Hourly Percentage Rate multiplied by the percentage increase (if any) in the Employment Cost Index, Private Industry, Benefits, 12-Month Percent Change, Not Seasonally Adjusted – CIU2010000000000A as published by the United States Department of Labor, Bureau of Labor Statistics (the "ECI Benefits Index") for the previous twelve month period. Should the ECI Benefits Index decrease over the previous twelve month period, then the applicable rates will not change. In addition to the above, Morrison's applicable Management Percentage Rate and Hourly Percentage Rate shall also be adjusted (either increased or decreased) to reflect changes in Applicable Law that affect Morrison's applicable Management Percentage Rate or Hourly Percentage Rate such as changes in payroll tax rates, insurance rates (e.g. federal or state unemployment insurance) or required benefits; such increases shall be changed effective from the date of change in such rates or benefits.

11.6 "**Proprietary Information**": all trade secrets and/or confidential or proprietary information related to the business of Morrison or its affiliates, in any physical, electronic, computerized or other form, including but not limited to: technical and nontechnical data related to operations; computer programs; software; licensed equipment/hardware, diet manuals; videotapes; methods; techniques; processes; finances; actual or potential customers and suppliers; existing and future products; recipes; production sheets; policy, procedure and/or

10

T:\Legal\DOCS\K\Senior Dining\Go Ye Village\Goyefee082206.Doc

personnel manuals; employees of Morrison and its affiliates; and any information which has been disclosed to Morrison by a third party which Morrison is obligated to treat as confidential.

11.7 **"Services"**: management of the food services at the Facility, including, but not limited to, and catered events, as exclusively provided to Client by Morrison under this Agreement.

11.8 **"Smallwares"**: non-powered kitchen related items used to prepare and serve food, such as pots, pans, scoops, chef knives, cutting boards, bowls, cooking and kitchen utensils and similar loose items, etc.

11.9 **"Tablewares"**: items used by individuals in consuming food, such as china, dishware, silverware, flatware, table utensils, glassware, etc.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives, effective as of the Effective Date.

WITNESS:

Nicole Nix

WITNESS:

David Williams

MORRISON MANAGEMENT SPECIALISTS, INC.

By _____

As its _Regional Vice President_

Date _8/28/06_

GO YE VILLAGE

By _____

As its _EXECUTIVE DIRECTOR_

Date _8/23/06_

11

## Morrison Management Specialists
## Sample Monthly Billing

Invoice Number:            Sample

                                    Remit      Morrison Management
RVP                                 to:        Specialists, Inc.
                                               P.O. Box 102289
                                               Atlanta, GA 30368-2289

House Code                 GO YE VILLAGE

                           Invoice for Period Ending:              31-Aug-06

                                    Cost of Food             $13,750.94
                                    Cost of Payroll           $5,490.82
                                    Management Fee            $2,500.00
                                    Administrative Fee        $1,250.00
                                    Direct Expense            $4,340.14
                                    Additional Amounts:
                                    Less  Pre-Bill:         ($27,115.66)

                                    Less Cash Sales:                 $0
                                    Total Due for Month       $27,332.17
                                    Over/Under Payment           $216.51
**Due Morrison Management Specialists, Inc.**            **$216.51**

T:\Legal\DOCS\K\Senior Dining\Go Ye Village\Goyefee082206.Doc

# A M E N D M E N T

### TO THE AGREEMENT BY AND BETWEEN
### MORRISON MANAGEMENT SPECIALISTS, INC.
(Hereinafter referred to as "Morrison")
and
### GO YE VILLAGE
(Hereinafter referred to as the "Client")

### With an Effective Date of October 16, 2006

IN ADDITION to the terms and conditions as set forth in the original Agreement, and any Amendments thereto, the following Amendment is made a part of the original Agreement:

Effective October 1, 2014, Paragraph 2.2(a) is hereby deleted and the following inserted therefore and made a part hereof:

> (a)  Morrison shall be allowed to charge and receive payments for general and administrative charges and management service fees, payable in equal, consecutive monthly installments annually which are included in the Pre-Bill in 2.1(b).  Morrison's general and administrative charges will be $18,808.80 annually, and Morrison's management service fee will be $36,560.16 annually.

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute this Amendment, in duplicate, on the date appearing with their respective signatures.

WITNESS:                                        MORRISON MANAGEMENT SPECIALISTS, INC.


_____              By _____
                                                            Jared Flayer
                                                     As its   Regional Vice President
                                                     Date _____

WITNESS: _David Williams_                GO YE VILLAGE

                                                     By _____

                                                     As its _Executive Director/CEO_

                                                     Date _1/7/15_